# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| **FREDDIE E. OWENS,** | ) | No._____ |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **DEATH PENALTY CASE** |
| | ) | **Execution date: June 25, 2021** |
| **BRYAN P. STIRLING**, in his official | ) | |
| capacity as the Director of the South | ) | |
| Carolina Department of Corrections | ) | |
| | ) | COMPLAINT FOR TEMPORARY, |
| and | ) | PRELIMINARY, AND INJUNCTIVE |
| | ) | RELIEF AND DECLARATORY |
| **SOUTH CAROLINA DEPARTMENT** | ) | JUDGMENT |
| **OF CORRECTIONS,** | ) | |
| | ) | |
| *Defendants*. | ) | |

GERALD W. KING
*Application for pro hac vice pending*
FEDERAL PUBLIC DEFENDER
Capital Habeas Unit
129 West Trade, St., Ste 300
Charlotte, NC 29202
(704) 688-6946

EMILY C. PAAVOLA
Fed. ID #11488
JUSTICE 360
900 Elmwood Ave, Suite 200
Columbia, SC 29201
(803) 765-1044

## INTRODUCTION AND OVERVIEW

1.      Plaintiff Freddie Eugene Owens is scheduled to be executed on Friday June 25, 2021 at 6:00 P.M. Although South Carolina's newly enacted statute (S.C. Code Ann. § 24-3-530 (2021)) provides for execution by multiple methods, Defendants intend to execute Plaintiff by electrocution because the other statutory options (lethal injection and firing squad) are "unavailable." However, lethal injection is not "unavailable," as evidenced by thirteen states and the federal government having carried out dozens of executions by lethal injection in recent years. Rather, what Defendants apparently mean by "unavailable" is simply that electrocution is more convenient, expedient, or possibly less expensive.

2.      Lethal injection is the primary method of execution in every jurisdiction that retains the death penalty in the United States, and had been South Carolina's primary method of execution since it was adopted on June 8, 1995. South Carolina made lethal injection the default method of execution because it is "more humane than dying in the electric chair." *Legislative Watch: Death Penalty*, The Times & Democrat (Orangeburg, S.C.), Mar. 2, 1985, at 2B.[1] Thus, at the time of Plaintiff's crime in 1997 and sentencing in 2006, South Carolina law provided that his execution would be carried out by lethal injection, unless he affirmatively selected electrocution or lethal injection was found by a court to be unconstitutional. *See* S.C. Code Ann. § 24-3-530 (1995).

3.      South Carolina and every other death penalty jurisdiction have turned away from electrocution because of "its specter of excruciating pain and its certainty of cooked brains and

---

[1] Of the nation's 1,533 executions since 1976, nearly 90% (1,350) have been by lethal injection. *Execution Database*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/execution-database (last visited May 25, 2021, as were all other websites visited). In the same period, only 163 executions have been by electrocution, with more than 140 of these occurring in the 70s, 80s, and 90s. *Id*. Three people have been executed by firing squad, equal to the number of people hanged. *Id*.

blistered bodies." *See Dawson v. State*, 554 S.E.2d 137, 144 (2001); *see also State v. Mata*, 745 N.W.2d 229, 269–78 (2008) (detailing the horrors of electrocutions). By compelling Plaintiff to die in their century-old electric chair, Defendants subject him to a substantial risk of excruciating pain, terror, and certain bodily mutilation that contravenes evolving standards of decency, offends basic principles of human dignity, and violates and the Eighth Amendment's prohibition on cruel and unusual punishment. Contrary to Defendants' assertions, lethal injection is a readily available alternative that would significantly reduce the risk posed by the electric chair. This Court should declare electrocution unconstitutional and permanently enjoin Defendants from electrocuting Plaintiff to death.

## I.

## JURISDICTION

4.    Jurisdiction of this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## II.

## NATURE OF ACTION

5.    This is a civil action for declaratory and injunctive relief brought by Plaintiff for violations and threatened violations of his rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.

6.    Plaintiff is a death-sentenced prisoner who has completed the ordinary appeals process and whose crime and sentencing occurred before the May 2021 change to South Carolina's execution law. *See State v. Owens*, 664 S.E.2d 80 (S.C. 2008); *see also* S.C. Code Ann. § 24-3-530 (2021) (amending the statute to allow for firing squad executions and making electrocution, instead of lethal injection, the default method of execution). Defendants are the individual and agency charged by state law with carrying out Plaintiff's execution.

- 2 -

7.     In April 2021, Plaintiff completed federal habeas review and received a warrant for his execution pursuant to *In Re Stays of Execution in Capital Cases*, 471 S.E. 2d 140 (S.C. 1996). His execution was scheduled for May 14, 2021. Plaintiff did not select electrocution (instead, he affirmatively selected lethal injection), and no court has held that lethal injection is unconstitutional. Under controlling law, Plaintiff was set to die by lethal injection. *See* S.C. Code Ann. § 24-3-530 (1995). But the South Carolina Department of Corrections (SCDC) failed to acquire the execution drugs, and Plaintiff's execution was stayed by the South Carolina Supreme Court.  After the stay, the General Assembly amended the statute to bypass Plaintiff's right to die by lethal injection. *See id*. § 24-3-530 (2021). Defendants now seek to execute Plaintiff in the electric chair.

8.     Electrocution violates Plaintiff's constitutional right to be free from cruel and unusual punishment. Plaintiff seeks a preliminary and permanent injunction preventing Defendants from carrying out his execution by electrocution.

### III.
### <u>PARTIES</u>

9.     Plaintiff Freddie Eugene Owens (aka, Khalil Divine Black Sun-Allah)[2] is a citizen of South Carolina under a sentence of death and in the custody of Defendant SCDC, which is led by Defendant Stirling. Plaintiff is incarcerated at the Edisto Unit of Broad River Correctional Institution (BRCI) in Columbia, South Carolina. Unless this Court grants injunctive relief, Plaintiff will be electrocuted at BRCI on June 25, 2021.

---

[2] By order of the Dorchester County Family Court, Mr. Owens's legal name was recently changed to Khalil Allah. However, all previous pleadings in his case have been filed under the name Freddie Owens.

10.     Defendant SCDC is the state agency in South Carolina charged with overseeing the custody and care of individuals incarcerated in South Carolina. It is also charged with carrying out and providing equipment for executions. S.C. Code Ann. § 24-3-520, § 24-3-540.

11.     Defendant Bryan P. Stirling is the Director of SCDC and is a citizen and resident of South Carolina. He is charged with overseeing and carrying out executions in South Carolina. *See id*. § 24-3-510. Defendant Stirling is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

12.     Defendants are acting in their respective official capacities with respect to all acts described herein, and their actions are under the color and authority of South Carolina law. Upon information and belief, unless preliminarily and permanently enjoined, each Defendant intends to act in his or her official capacity and under the authority of state law to execute Plaintiff in the electric chair in violation of his constitutional rights.

**IV.**
**FACTS**

13.     In 2016, Defendant Stirling announced publicly that the South Carolina Department of Correction's lethal injection "drugs had expired [in 2013], and [he and SCDC] were going to have a hard time obtaining the drug [pentobarbital]." John Monk, *Controversial bill proposed to get stalled SC executions back on track*, The State, Mar. 6, 2016, https://www.thestate.com/news/local/article64471007.html. Since then, South Carolina, unlike other states, has failed to take the necessary steps to obtain lethal injection drugs. Defendants declined to ask the Legislature for funding to construct their own compounding pharmacy to make lethal injection drugs because, as Stirling said, "it just didn't make a lot of sense to use tax dollars to buy something we could get for a lot less on the open market." *Id*.

- 4 -

14.     Additionally, attempts to enact a law that would have shielded the identity of drug manufacturers and compounding pharmacies failed in prior sessions of the General Assembly. *E.g.*, S. 553, 121st Session (2015-2016); H. 3853 121st Session (2015-2016); S. 871, 122nd Session (2017-2018); H. 4629, 122nd Session (2017-2018); H. 3354, 123rd Session (2019-2020). In the most recent legislative session, lawmakers made no attempt at passing a shield law, and Defendants did not request the General Assembly to enact such a provision.

15.     Meanwhile, other jurisdictions have continued carrying out executions by lethal injection. For example, in October 2013, the same month Defendant Stirling took over at SCDC, Texas carried out its first lethal injection using pentobarbital from a compounding pharmacy. Since then, Texas has carried out 70 executions by lethal injection. *Execution Database*, DPIC. Additionally, the federal government and at least seven other states—Georgia, Oklahoma, Virginia, Ohio, Mississippi, Louisiana, and Pennsylvania—have purchased lethal injection drugs from compounding or importing pharmacies.

16.     Within the last few months, Arizona secured a new batch of pentobarbital. Jacques Billeaud, *Arizona finds death penalty drug after hiatus in executions*, AP News, March 5, 2021, https://apnews.com/article/arizona-phoenix-executions-6f0ce846e174119635509e0c16b9ac1d. In the eight years that Defendants have claimed the execution drugs are unavailable, 13 states and the federal government have carried out 207 lethal injection executions, including thirteen by the federal government in the past twelve months. *Execution Database*, DPIC. Indeed, Texas carried out the fourth lethal injection of the year on May 19, less than a week after South Carolina statutorily eliminated Plaintiff's right to die by lethal injection. *See id*. All lethal injections in the last year have been by a single dose of pentobarbital. Excluding South Carolina, four executions

are currently scheduled for 2021, all of which will be carried out with a single dose of pentobarbital.

17.    In January, Plaintiff completed federal habeas review, and his execution was set for March 14, 2021. Although Defendants knew they did not have the drugs necessary to carry out an execution, they began the process of preparing Plaintiff for his execution and asked him to choose between lethal injection and electrocution. Plaintiff selected lethal injection. Defendants, however, still had not acquired the drugs. The Supreme Court of South Carolina vacated the execution notice and stayed Plaintiff's execution until Defendant SCDC could perform the execution.

18.    After Plaintiff's and two other prisoners' execution stays, South Carolina became the first and only state in the country to enact an execution method scheme that is less humane than the earlier scheme. *See* S.C. Code Ann. § 24-3-530 (2021). In doing so, the General Assembly effectively made electrocution the mandatory method of execution in South Carolina. The statute makes electrocution the default method of execution and purports to give death-sentenced prisoners an option to die by firing squad. *See id.* The 2021 legislation is the first to break with more than 100 years of American jurisdictions implementing more humane methods of executions, which has culminated with lethal injection being the dominant method in every other death penalty jurisdiction in the United States.

19.    According to the Supreme Court of the Unites States, lethal injection is "the most humane [execution method] available." *Baze v. Rees*, 553 U.S. 35, 62 (2008); *see also Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (observing that a single dose of pentobarbital is "widely conceded to be able to render a person fully insensate and does not carry the risks of pain that some have associated with other lethal injection protocols" (internal quotations omitted)). There is a

"consensus among the States and the Federal Government that lethal injection is the most humane method of execution." *Workman v. Bredesen*, 486 F.3d 896, 907 (6th Cir. 2007).

20.     On the other hand, electrocution, which has been rejected as a primary method of execution by every other jurisdiction that retains the death penalty, and which is not used as a method of execution anywhere else in the world, carries a heightened risk of an excruciating death, mutilates the prisoner's body, and offends basic concepts of human dignity. Even under "ideal" conditions, electrocutions often go horribly wrong. John P. Wikswo, Jr. Aff. ¶ 11–12, 14–15 (April 27, 2021), attached as Exhibit 1. An electrocuted person can experience a slow, painful death by suffocation as his internal organs are slowly cooked. *Mata*, 745 N.W.2d 269–78. Once the switch is thrown, the prisoner's muscles will all be stimulated to full contraction, his organs can boil, his head may catch fire, his eyes may pop out, his body will likely blister, and the smell of his burnt flesh will permeate the room. *Glass v. Louisiana*, 471 U.S. 1080, 1087–88 (1985) (Brennen, J., dissenting from denial of certiorari); *see also Dawson*, 554 S.E.2d at 143; Jonathan L. Arden Aff. ¶¶ 9–10 (May 14, 2021), attached as Exhibit 2. Additionally, the executed individual may bleed from his nose and eyes as well as defecate and urinate on himself.

21.     Importantly, having to litigate Plaintiff's claim under an execution warrant is the Defendants' own doing. They and the General Assembly have known since at least 2013 that SCDC did not have lethal injection drugs and would have trouble getting them. They also knew that a cohort of persons under sentence of death were nearing the end of the ordinary appeals process and that their execution dates would be set automatically. Indeed, Defendants waited until Sigmon and Owens were under execution warrants before informing the Supreme Court of South Carolina that they could not carry out a lethal injection. Then, instead of finding a way to get the drugs like 14 other jurisdictions have done, Defendants pressured the legislature to make

- 7 -

electrocution the default method of execution. The new law went into effect on May 14, 2021. Five days later, SCDC notified the South Carolina Supreme Court that it is prepared to carry out an execution by electrocution and that it is the only method they are prepared to use. *See* Electrocution Letter (May 19, 2021), attached as Exhibit 3. The South Carolina Supreme Court ordered Defendants to carry out Plaintiff's execution in an order entered on June 1, 2021. Defendants now intend to execute Plaintiff in SCDC's century-old electric chair on June 25, 2021.

### History of Electrocution in the United States and South Carolina

22.    Toward the end of the 19th century, jurisdictions began looking for more humane methods of executions, largely because of repeated botched hangings combined with the growing public discomfort from the parallels between lynchings and state-sanctioned hangings. *See* Elbridge T. Gerry, *Capital Punishment by Electricity*, 149 N. AM. REV. 321, 322–24 (1889).

23.    In 1888, following an investigation conducted by a Commission tasked with discovering a more humane means of execution, New York became the first state in the country to adopt electrocution as a method of execution. This was largely a historical accident. One of the Governor's appointees to the Commission was Dr. Alfred Southwick, a dentist from Buffalo, New York. He suggested using electricity as an alternative to hanging largely because he had witnessed what he thought to be the fast and painless death of an individual who accidently touched an electric generator. Southwick enlisted Thomas Edison in his efforts to persuade the Commission to propose using electricity to carry out executions. Edison agreed to help Southwick primarily for commercial reasons. He was then losing what has been deemed the "battle of the currents"; George Westinghouse's alternating current (AC) brand of electricity was more efficient and less expensive that Edison's direct current (DC) system. Deborah Denno, *Is Electrocution an Unconstitutional*

*Method of Punishment? The Engineering of Death Over the Century*, 35 WM. & MARY L. REV. 551, 567-73 (1994).

24.     Edison believed that if he could associate AC with causing death, it would diminish consumers' enthusiasm for AC current and give his DC system an advantage in the marketplace. And so Edison informed Southwick and the Commission that the current from one of Westinghouse's AC machines could "even by the slightest contacts, produce instantaneous death." *Id*. at 571. Given Edison's fame, his opinion carried the day and the Commission recommended, and the New York legislature subsequently enacted, an execution law embracing death by electrocution. *Id*. at 571-72.

25.     When William Kemmler was condemned to die in New York's electric chair, he challenged its use under state and federal law. His appeals were financed by George Westinghouse as part of a last-ditch effort to prevent AC from being used for execution purposes. The case eventually made its way to the Supreme Court of the United States. Kemmler's attorneys argued that electrocution constituted "a cruel and unusual punishment." *In re Kemmler*, 136 U.S. 436, 439 (1890). The Supreme Court rejected Kemmler's arguments but did not reach the Eighth Amendment issue as the amendment had not yet been incorporated against the states. *Id.* at 448–49. The Court determined that New York had adopted electrocution "in the effort to devise a more humane method" of execution and that the enactment of the statute was therefore "within the legitimate sphere of the legislative power of the state." *Id*. It then deferred to the reasoning of the New York state courts: "the evidence is clearly in favor of the conclusion" that "electrical science" had made it possible to "generate and apply to the person of the convict a current of electricity of such known and sufficient force as certainly to produce instantaneous, and therefore painless, death." *Id.* at 443.

26.    Despite this statement, there has never been any scientific support for the proposition that death by electrocution is instantaneous and painless. Many of the tests conducted by the designer of New York's electric chair did not result in the immediate or painless deaths of the animals used in the electrocution events. *See* Thomas P. Hughes, *Harold P. Brown and the Executioner's Current: an Incident in the AC-DC Controversy*, 32 The Business History Review 2, 148 (1958) (noting that some of the effects of the electricity on the animals were "heartrending in the extreme"). But one of *Kemmler*'s legal conclusions is viable and relevant here— "Punishments are cruel when they involve torture or a lingering death . . . . something more than the mere extinguishment of life." 136 U.S. at 447. The expert declarations attached as Exhibits 1 & 2 refute any argument that death in the electric chair is quick and painless but rather reveal it to involve torture and lingering death. *See* Affidavits of John P. Wikswo and Jonathan L. Arden.

27.    Kemmler was the first person to die in an electric chair in the United States. When the executioners applied the first burst of 1000 volts of electricity, Kemmler did not die. They applied a second burst of 2000 volts, and it eventually killed him. In the process, Kemmler's hair caught fire, his skin was charred, his blood vessels burst, and the room filled with the stench of cooked human flesh. Stuart Banner, *The Death Penalty: An American History* 186 (2002). The autopsy revealed "extensive charring" of Kemmler's body. One doctor who witnessed the execution said, "I want never again to witness anything like that. You may kill a man—but kill him." Denno, 35 Wm. & Mary L. Rev. at 601.

28.    Despite the horror of Kemmler's death, the lack of scientific or empirical support for the underlying assumption that death by electrocution was swift and painless, and despite the commercial and political influences behind the original recommendation of electrocution as a

possible method of execution, other states adopted the electric chair as their primary means of execution. *See*, *generally*, *id*.

29.    South Carolina purchased its electric chair in 1912 from the Adams Electric Company in Trenton, New York, for $2800. *First Electrocution in State Today*, The Herald & News (Newberry, S.C.), Aug. 12, 1912 at 3; *see also* Letters to State Electrician T.O. Boozer, File No. S112033 General Correspondence, attached as Exhibit 4. On information and belief, the 1912 chair, nicknamed "Old Sparky," is the same chair Defendants intend to use to execute Plaintiff.

30.    In 1912, just a few months after he was sentenced to death, William Reed became the first person to die in South Carolina's electric chair. Defendant SCDC executed Reed by attaching one electrode to his head, another to his ankle; placing a leather mask over his face; and applying a burst of 1900 volts of electricity for nine seconds, followed by another burst of 200 volts, and a third burst of 1900 volts for sixty seconds. *First Electrocution in State Today*, The Herald & News (Newberry, S.C.), Aug. 12, 1912 at 3.

31.    A significant percentage of executions in South Carolina's electric chair produced wanton pain and suffering. It is possible that as many as 30 percent of all electrocutions in South Carolina did not go according to plan. John P. Wikswo, Jr. Aff. ¶ 13. Many electrocutions, in South Carolina and other jurisdictions, resulted in a tortuous death and unexpected events, such as burning flesh, smoking bodies, and beating hearts when the prisoner was expected to already be dead. Moreover, all electrocutions leave behind a mutilated corpse. *Dawson*, 554 S.E.2d at 143 (the body is mutilated "whether or not the electrocution protocols are correctly followed and the electrocution equipment functions properly").

32.    On information and belief, Defendant SCDC and its employees never developed a scientifically or medically supported method for carrying out executions by electrocution. Instead,

when an execution did not go as planned, Defendant SCDC picked a new voltage (ultimately ranging from as low as 1350 volts to as high as 7000 volts) or length of application time for the next execution, essentially guessing-and-checking the means to accomplish the "instantaneous" and "painless death" promised by the United States Supreme Court in *Kimmler*.

33.     The following are some examples of how people have died in South Carolina's electric chair:

a.     It took eleven minutes and multiple applications of current to kill Chris Aussie Moore in May of 1930. During his execution, one witness fainted and another had to leave the room. *Allendale Negroes Electrocuted: Pair Meet Death Admitting Crime and with Prayer*, The Index-Journal (Greenwood, S.C.), May 16, 1930, at 1.

b.     The next year, when 17-year-old Norman Blakely was put to death, he still had a strong heartbeat after he was hit with two electrical shocks carrying a current of 13 amperes. After the state electrician, Sam Cannon, began the execution, "Blakely shot upward in the chair as electricity crackled into him." Blakely's "body contorted and the lips clenched grimly." Ashley Halsey, *Blakely Pays in Chair for Garrett Death*, The Greenville News, May 27, 1931, at 1.

c.     In 1935, after Thurmond Harris was put to death in the electric chair, a witness commented, "The smell of that burning human flesh, the stiffening of the body of that moronic youth as the 2,300 volts cursed through it, and the twisted face when the mask was lifted off it are something that will not be easily erased from the memory." Frederick Smith, *About South Carolina*, The Charlotte Observer, June 16, 1935, at section 3, p. 10.

d.     In 1939, SCDC executed six men in the span of 50 minutes, necessitating "smelling salts" to revive witnesses who fainted. The first person to die that day, 19-year-

old George Wingard, walked to the electric chair to the sound of his five codefendants singing the hymn, "Till We Meet." Harry Ashmore, *Roy Suttles Says Did Not Shoot Kelly*, The Greenville News, Mar. 25, 1939, at 1. When the state electrician threw the switch, Wingard's body tensed, his head banged against the back of the chair, and flames danced on his skin. The electrician turned the current off and on three times. After Wingard finally died, employees of SCDC carried his body away "frozen," stuck in a seated position. Banner, *The Death Penalty: An American History* at 192. The second man to die, William B. Woods, was left with burn marks and a "seared leg where [the] clamp fits." Harry Ashmore, *Roy Suttles Says Did Not Shoot Kelly*, The Greenville News, Mar. 25, 1939, at 11. When the third man, Roy Suttles, had his "thin legs and arms" strapped into the chair, he was "nervous and tense." When the switch was thrown, his "pants caught fire and glowed." The three other men executed that day prayed as they went to their deaths, their voices "broken off by current," with water dripping from the headpiece and leg strap. *Id.*

e.     In 1942, Defendant SCDC electrocuted John K. Robinson. A news report recounted the execution: Robinson's body "stiffened as the high voltage tore through his limbs and torso. [He] was raised about three inches out of the chair. Lights on the switchboard panel flickered and the youth sank back into the chair." The state electrician threw the switch a second time, "and again the shock raised him up from the wooden seat." Charles Kelly, *Next Stop, Eternity* 241 (2016) (quoting two news reports from the Spartanburg Herald).

f.     The following year, SCDC carried out the execution of Jesse Jones, a "slight" young man who was known to be "mentally-deficient." *Jesse Jones Is Executed for Murder*, The Gaffney Ledger (Gaffney, S.C.), Apr. 6, 1943, at 5. Jones appeared not to

understand what was happening and struggled with the executions as they strapped him into the chair, crying "you've got the wrong man" and begging to know "[w]hat I done?" *Id.*; Kelly, *Next Stop Eternity* at 50. When the first 2,200 volts of electricity hit Jones, "[t]he negro was raised several inches out of the chair, then settled back into position as the current was released." *Jesse Jones Is Executed for Murder*, The Gaffney Ledger (Gaffney, S.C.), Apr. 6, 1943 at 5. Witnesses watched "[g]reat blisters" form on his right leg as smoke drifted up from the metal headpiece, and "the faint odor of burned human flesh could be smelled." When the electrician applied the second burst, "blisters began swelling on his forehead," while the blisters on his leg "grew larger, and seemingly threatened to burst." *Id.*

g.      According to records maintained by Defendant SCDC, George Stinney, Jr., who was fifteen years old at the time of his death, weighed only 95 pounds and was barely five feet tall. Because of Stinney's small size, employees of SCDC could not strap him into the chair and properly attach the electrodes. Problem solving, they made Stinney sit on a Bible. While transporting Stinney's body to a funeral home, the hearse driver heard Stinney sigh and discovered he was still alive. By the time they arrived at the funeral home, Stinney's heart had stopped beating. Kelly, *Next Stop, Eternity* at 82.

h.      In 1947, it took five minutes and 47 seconds to execute Ernest Willis, whose heart continued to beat after the first series of currents were applied. *Two Die for Murder*, The Charlotte News, Aug. 15, 1947, at 4.

i.      The same year, a circuit shorted during Rose Marie Stinnette's execution, causing a light fuse to blow out and creating a "ghostly scene in the death house."

Witnesses reported seeing "sparks fly from the woman's head and arms, which dimly lighted the room." *Electrocute Dixie Woman*, The Pittsburgh Courier, Feb. 1, 1947, at 16.

  j.  Raymond Carney died in South Carolina's electric chair in 1954. It took five bursts of electricity and more than six minutes to kill him. "The force of the first jolt of [2400 volts of] electricity yanked the front legs of the recently-rebuilt electric chair from their floor bolts," prompting prison officials to move witnesses away from the chair. *Carney Is Executed at Columbia*, The Times & Democrat (Orangeburg, S.C.), May 8, 1954, at 1.

  k.  In 1985, SCDC electrocuted Joseph Charles Shaw, who weighed 260 pounds. Shaw's body "lurched abruptly against the restraints on the chair, causing a flapping noise," and "[t]hin wisps of what appeared to be smoke rose from the rolled-up pants leg." Harvey Burgess, *Media Witness Recounts Details of Shaw's Last Moments*, The Times & Democrat (Orangeburg, S.C.), Jan. 12, 1985, at A1.

  l.  More recently, SCDC electrocuted James Neil Tucker in 2004. As employees of SCDC recounted in unrelated litigation, Tucker's head shot back, his body convulsed, and the smell of burning flesh lingered in the room. When his body was removed from the chair, it was locked in a sitting position. The execution team then took the hood off of his head, revealing that his face was "black," his mouth was "wide open," and that Tucker likely died experiencing "gruesome pain." *Baxley v. Ozmint*, No. 3:07-cv-040670CMC, Baxley Dep., ECF No. 47-8 at 140-41 (Jan. 24, 2008).

34.  The current used by Defendant SCDC over the last 100 years has irrationally fluctuated. *See* John P. Wikswo, Jr. Aff. ¶ 13. Defendants intend to continue this trend by

electrocuting Plaintiff without any explanation of how or why they settled on the most recent protocol.

35.    Electrocution was South Carolina's sole method of execution from 1912 through the 1950s, 1960s, and for nearly a decade after the state passed its new death penalty law in 1977.

36.    Since the 1960s, six men have been executed in South Carolina's electric chair. On information and belief, Defendant SCDC used at least three different voltages for varying lengths of time to carry out these six executions.

37.    By the 1980s, it had become clear that the electric chair could not accomplish a quick or painless death. As a result, many states adopted new execution laws replacing electrocution with lethal injection because it was thought to be more humane and because it was "visually palatable relative to other methods." *See* Deborah W. Denno, *The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty*, 76 FORDHAM L. REV. 49, 65 (2007).

38.    On June 8, 1995, South Carolina became the 25th state to adopt lethal injection. *See* S.C. Code Ann. § 24-3-530 (1995). The statute permitted a death-sentenced inmate to select death by lethal injection but retained electrocution as an option. It also provided that if lethal injection were found to be unconstitutional, condemned prisoners would die by electrocution. One of the sponsors of the bill, Representative Harry Hallman, explained that the change from electrocution to lethal injection was necessitated by the reality that "lethal injection is more humane than dying in the electric chair." *Legislative Watch: Death Penalty*, The Times & Democrat (Orangeburg, S.C.), Mar. 2, 1955, at 2B.

39.    Since 1995, 36 of the 39 executions in South Carolina have been by lethal injection. *Execution Database*, DPIC. On information and belief, two of the three men who selected electrocution were severely mentally ill and possibly incompetent at the time of their executions.

- 16 -

40.    Earlier this year, while debating the most recent changes to the law, one of the sponsors of the amendments, Richard "Dick" Harpootlian, characterized electrocution as "not much better" than hanging in light of the risk of disastrous botches: "They are burned to death. There is instance after instance after instance where people are not dead after the first jolt. They're screaming and on fire. Horrible, horrible thing to do to another human being." 124th S.C. Gen. Assemb., Senate, Mar. 2, 2021 (statement of Sen. Richard A. "Dick" Harpootlian).

41.    During the same debate, another sponsor of the amendments, Senator Greg Hembree, observed that it was "not the government's place" to "torture anybody needlessly," and consequently, "[lethal injection] is an option that, in my view, would be more humane than the electric chair." *Id.* (statement of Sen. Greg Hembree).

### South Carolina's Electrocution Process[3]

42.    On information and belief, Defendants plan to execute Plaintiff using the same basic equipment and procedures that have been in place since they acquired the electric chair in 1912. *See* John P. Wikswo, Jr. Aff. ¶ 13. The process is premised on the concept that the first jolt of electricity will stop the heart and end brain functioning, rendering the condemned person unconscious and insensate. There is no scientific evidence to support this assumption. John P. Wikswo, Jr. Aff. ¶ 12; Jonathan L. Arden Aff. ¶ 7–8, 13.

43.    On information and belief, on the day of Plaintiff's scheduled execution, Defendants will shave Plaintiff's head and his right leg from his knee to his ankle. Plaintiff will be required to shower and then dress in pants that are cut off at the knee. Defendants will apply a

---

[3] All protocols described in this complaint are publicly available and have been filed as exhibits in recent litigation in state and federal courts. Here, Plaintiff uses the public protocols for argument's sake. Plaintiff's challenge applies equally to the confidential protocol. There is no constitutional way to execute someone by electrocution.

"conducting gel" to Plaintiff's right calf and the crown of his head. *See* South Carolina 2002 Execution Protocol, attached as Exhibit 5.

44.    On information and belief, Defendants will attach two electrodes to Plaintiff's body. They will affix one electrode to his right calf via a copper anklet, and they will attach a second electrode to the top of a helmet made of leather and copper mesh that they will strap to Plaintiff's head and buckle to the chair. *See* SCDC, *Electric Chair Operations,* June 2020 FOIA Response, attached as Exhibit 6. On information and belief, the helmet apparatus is the same equipment that Defendant SCDC purchased from Fred Leuchter in 1983 for $800. *See* William Fox, *Electric Chair Designed to Be Most Humane, Official Says*, The Greenville News, Sept. 5, 1991, at 10A. The inner layer of the helmet is made of sponge, which Defendants will soak in an ammonia chloride solution to increase conductivity and prevent the equipment and Plaintiff from catching fire. Defendants will then put a leather hood over Plaintiff's head, and they will use three sets of straps to secure him to the chair: back arm straps, forearm straps, and ankle straps. *See* South Carolina 2002 Execution Protocol, attached as Exhibit 5.

45.    An SCDC document titled *Electric Chair Operations* called for the state electrician to engage the circuit breaker and initiate the automatic electrocution cycle: 2000 volts at an estimated five amperes for five seconds, followed by 1000 volts at an estimated two amperes for eight seconds, followed by 250 volts at an unspecified amperage for two minutes. Exhibit 5.

46.    On information and belief, since 1912, Defendants have used a protocol substantially similar to this at least two dozen times. Of those executions, at least eight did not go as planned—the condemned person had to be shocked three or more times before they were pronounced dead; there was a heartbeat detected after the electricity was turned off; the execution produced smoke, fire, or sparks; or the condemned person experienced severe involuntary muscle

contractions. These men almost certainly experienced excruciating and constitutionally intolerable pain.

47.    When electricity is applied to a human body in the manner Defendants are seeking to execute Plaintiff, the current travels along all possible paths between the electrodes attached to the top of the head and the right calf. The greatest concentration of electrical current will follow the path of least resistance; what part of the body comprises the path of least resistance will vary among individuals, but it normally the skin and blood vessels, not the skull. It will also vary in the individual during the execution event, depending on factors including their skin resistance, skull thickness, and body composition. John P. Wikswo, Jr. Aff. ¶ 12(d); *see also* Deborah Denno, *Getting to Death: Are Executions Constitutional?*, 82 IOWA L. REV. 319, 357–58 (1997).

48.    Because the skull is, for all humans, among the most electrically resistant parts of the body, the vast majority of the electrical current will travel through the skin and blood vessels around the person's head and neck, down their torso, and down their legs until it reaches the leg electrode. Because Defendants use alternating current, the electricity will then follow the path of least resistance in the opposite direction approximately sixty times per second. Throughout this process, the skull will effectively insulate the brain from much of the electrical current. These facts create a significant risk of a prolonged, excruciating death. John P. Wikswo, Jr. Aff. ¶ 12–13.

49.    For decades, observers have expressed concern about electrocution as a method of execution in South Carolina and around the country. For example, Fred Leuchter—a notorious and ultimately disgraced advocate of electrocution who sold Defendant SCDC some of its electric chair equipment—warned in 1991 that the manner in which South Carolina carries out electrocutions runs two major risks: "restart[ing] the heart," creating "a human vegetable sitting in the chair," and "cooking of body tissue . . . to the point that it can be pulled off the individual's body like a cooked

chicken." *Electric Chair Designed to Be Most Humane, Official Says*, The Greenville News, Sept. 5, 1991, at 10A.

50.     Electrocution cannot produce immediate death because it does not instantly stop brain functioning. When electrocution does eventually end brain activity, it does so either by indirect thermal transfer (slow heating of the brain tissue) or oxygen loss (suffocation) that occurs when breathing muscles clench involuntarily. Harold Hillman, *The Possible Pain Experienced During Execution By Different Methods*, 22 Perception 745, 748 (1993). Under these circumstances, minutes may elapse during which the person being executed remains conscious and subject to unbearable pain but incapable of voluntary movement or communication. *See id.*

51.     Additionally, because electrocution causes sudden, involuntary muscle contractions, people killed in the electric chair experience blunt force trauma in addition to suffocation, cardiac arrest, severe burns, and involuntary body functioning. John P. Wikswo, Jr. Aff. ¶ 14; Jonathan L. Arden Aff. ¶¶ 9–11, 14.

52.     Electrocution essentially always causes significant burning and charring of the body. Many autopsies from executions by electrocution revealed burns on the legs and scrotum, which would be extremely painful. Jonathan L. Arden Aff. ¶ 14.

53.     In addition to the direct physical pain that electrocution causes, it can also trigger the sensation of pain by activating the brain's pain-sensing regions in a manner similar to "phantom limb pain" experienced by amputees. Brief of Physicians for Human Rights *et al.* as Amici Curiae in Support of Reversal at *7, *Bryan v. Moore*, 528 U.S. 960 (1999) (No. 99-6723), 1999 WL 1249424. This phenomenon occurs when electrical current is applied to an area of the brain that controls the experience of pain. *Id.*

54.     Because the pain-regulating regions of the brain are located deep within the brain and are therefore protected from the source of current in a judicial electrocution, it is unlikely that they are destroyed by the initial application of electricity. *Id.* Instead, it is likely that during a judicial electrocution, weaker, non-destructive current reaches the pain-sensing regions of the brain and causes those regions to become activated. *Id.* If this occurs, the person subject to electrocution would experience intense pain.

55.     Electrocution also mutilates the prisoner's body. With essentially all electrocutions, the prisoner suffers severe burns with charring of the tissues, predominantly surrounding the areas where the electrodes attach but also to other places of the body, including the upper legs and scrotum. *See* Jonathan L. Arden Aff. ¶¶ 9, 14. The prisoner's brain can also cook to the point of swelling, a process that must happen while the prisoner is alive. *Id*. at ¶ 10. In some cases, the condemned men may catch fire, their eyes could pop out, limbs contort, or their organs boil. *Glass*, 471 U.S. at 1087–88 (Brennan, J., dissenting from the denial of certiorari).

## V.

## CLAIMS FOR RELIEF

### Count I: Eighth and Fourteenth Amendment Violation – Cruel and Unusual Punishment

56.     Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this complaint as if set forth in full below.

57.     The Eighth Amendment forbids states from carrying out executions by a method that "superadds pain to the death sentence" beyond what is necessary to extinguish life. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019). Specifically, "[p]unishments are cruel when they involve torture or a lingering death. . . . something more than the mere extinguishment of life." *In re Kemmler*, 136 U.S. at 447.

58.    To prevail on a claim that a specific method of execution violates the Eighth Amendment, a plaintiff must make two showings: (1) that the challenged protocol "creates a demonstrated risk of severe pain" and, (2) "that the risk [of severe pain] is substantial when compared to the known and available alternatives." *Glossip v. Gross*, 576 U.S. 863, 878–79 (2015).

**Electrocution Creates a Demonstrated Risk of Severe Pain and Suffering**

59.    There is a substantial risk that death by electrocution will cause severe pain. John P. Wikswo, Jr. Aff. ¶ 11, 15.

60.    Death by electrocution is caused by asphyxiation and/or organ damage due to thermal heating, *i.e.*, cooking. Both processes take time, meaning death in the electric chair is not instantaneous. *Id*. at ¶ 11–12.

61.    A person subjected to the electric chair may remain conscious and sensate for some period during the electrocution event. A person only loses consciousness during an electrocution when they lose brain functioning, which occurs through either (1) a direct assault on the brain; or (2) insufficient blood circulation to the brain. Both processes take time, meaning a person subjected to death in the electric chair will remain conscious and sensate during the electrocution. *Id*. at ¶ 12, 14.

62.    Because a person subjected to death in the electric chair can remain alive, conscious, and sensate during the electrocution, there is a significant likelihood of excruciating pain during the event. Electrocution produces various physiological reactions: burning and charring of the skin; thermal heating, *i.e.*, cooking of the body and internal organs; direct excitation of sensory, motor, secretory, and autonomic nerves; direct excitation of brain nerves, causing sensations of sound, light, dread, and fear; simultaneous contractions in the flexor and extensor muscles (e.g., the hamstring muscle on the back of the thigh and the quadriceps muscle on the

front of the thigh at the same time); contraction of the muscles necessary for breathing, preventing the person from inhaling or exhaling and causing the person to suffocate. All of these reactions would likely cause extreme pain. John P. Wikswo, Jr. Aff. ¶ 12; Jonathan L. Arden Aff. ¶¶ 9–11, 14.

63.    Death in the electric chair also produces needless and wanton psychological suffering. During the electrocution process, the condemned person's perception of time may become distorted, causing him to experience the electrical trauma as lasting dramatically longer than it appears to a bystander and causing him to perceive each of the sixty cycles of electrical current that will pass through his body every second. When the electrical current directly excites brain nerves, it may trigger sensations of sound, light, dread, and fear. And because Defendants tightly strap condemned people into the electric chair and cover their faces with a leather hood, they are unable to signal when they are experiencing pain or suffering. John P. Wikswo, Jr. Aff. ¶ 12.

64.    Because of the unpredictability and variability of any given individual's electrical resistance and that of the electric chair apparatus during an electrocution, the current delivered to one prisoner will vary significantly from the current delivered to other prisoners. As a result, the amount of time an individual prisoner remains alive, conscious, and sensate are unknown and will vary substantially from person to person. John P. Wikswo, Jr. Aff. ¶ 12(d).

65.    There is evidence that an executed person experienced excruciating pain and suffering in at least 30 percent of all electrocutions Defendants have carried out in the electric chair. John P. Wikswo, Jr. Aff. ¶ 13. Of the seven executions Defendants have carried out in the electric chair since 1985, there is evidence of excruciating pain and suffering in at least five

executions.[4] These estimates are almost certainly a significant undercount of the true totals because, as explained above, a person executed in the electric chair cannot signal when they are experiencing pain or suffering.

66.    More broadly, evidence from other states confirms that death in the electric chair "superadds" pain and creates a constitutionally impermissible risk of extreme suffering. For example, in 1985, Justice Brennan described various problems with the electric chair, including the likelihood that a prisoner could catch fire or otherwise have his body mutilated while strapped in the electric chair. *Glass*, 471 U.S. at 1087–88 (Brennan, J., dissenting from the denial of certiorari). Similarly, the Supreme Court of Nebraska concluded that "electrocution will unquestionably inflict intolerable pain unnecessary to cause death in enough executions so as to present a substantial risk that any prisoner will suffer unnecessary and wanton pain in a judicial execution by electrocution." *Mata*, 745 N.W.2d at 278.

67.    In 1983, it took Alabama fourteen minutes and three attempts to execute John Evans in the electric chair. After prison officials applied the first burst of 1900 volts, smoke and sparks poured from under the hood covering Evans's face and the room filled with the smell of burning flesh and clothing, prison doctors determined that Evans was still alive. *Id.* at 1091–92. Prison officials applied a second burst of electricity for another thirty seconds, and more smoke filled the room, along with the increasingly sickening smell of burning flesh, but again doctors determined that Evans was not dead. It was only after prison officials had applied a third jolt of electricity that prison doctors declared him dead. *Id.*

---

[4] The five men are Pee Wee Gaskins, James Terry Roach, Joseph Carl Shaw, James Neil Tucker, and James Earl Reed.

68. In 1990, it took Virginia executioners more than five minutes to electrocute Wilbert Lee Evans. During the execution, Evans bled so profusely that his shirt became soaked in blood. Deenan L. Brown, *Execution Probe Sought*, Wash. Post, Oct. 21, 1990, at B1.

69. That same year, Florida officials attempted to execute Jesse Tafero for more than four minutes. After applying three separate cycles of electricity at 2000 volts, Tafero appeared to still be alive. As spectators watched, a fire ignited on Tafero's head, with six- to twelve-inch flames rising from his body and filling the chambers with smoke. During the fire, Tafero continued to produce "gurgling sounds." *See* Br. of App. at 20, *Buenoano v. Florida*, 565 So.2d 309 (June 18, 1990).

70. Although Virginia prison officials rewired their electric chair in the wake of Wilbert Lee Evans's torturous death, it nevertheless took two attempts for them to kill Derick Peterson in 1991. Karen Haywood*, Convicted Killer Executed in Virginia, But Only on Second Try*, AP News, August 23, 1991, https://apnews.com/article/77b06f17fdeb31c1c23347adc150a3a5.

71. In 1998, Florida attempted to execute Pedro Medina in the electric chair. As with Tafero, Medina caught on fire. Media lurched backwards and balled his hands as blue and orange flames up to a foot long shot from the right side of his head. One witness recalled that the execution was "brutal, terrible. It was a burning alive, literally." Ron Wood, *Flames erupt from man's face mask during death sentence electrocution*, AP News, March 25, 1997, https://apnews.com/article/ae9d4a0e21a72803fe299daac7850440. The smell of burnt flesh lingered as the witnesses left. *Id*. There are numerous other cases of "botched" electrocutions in the United States.

72.    If Defendants are permitted to carry out Plaintiff's execution in the electric chair, there is a strong likelihood that he will suffer a torturous, terrifying death. Death by electrocution superadds pain to a death sentence that Defendants could carry out using lethal injection.

**Electrocution Violates Human Dignity Due to the Mutilation of the Body**

73.    The Eighth Amendment also protects human dignity. The Supreme Court stated in *Trop v. Dulles*, 356 U.S. 86, 100 (1958) that the "basic concept of the Eighth Amendment is nothing less than the dignity of man." *See also Hall v. Florida*, 572 U.S. 701, 724 (holding that Florida's practice of disregarding the standard error or measurement violated the Eighth Amendment because it was inconsistent with "our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world"). Mutilating prisoners' bodies is antithetical to human dignity.

74.    Repulsion at the mutilation of prisoners' bodies existed before the founding and has survived as an American tenet. Writing in 1769, William Blackstone described the "occasion a mutilation or dismembering" as "disgusting," though he comforted the "English reader" by reminding her that such punishments were rare but accepted in most other European countries. The University of Chicago, *The Founders' Constitution*, William Blackstone, Commentaries on the Laws of England, https://press-pubs.uchicago.edu/founders/documents/amendVIIIs4.html. At the time, Mutilation included slitting nostrils, cutting off ears, and branding hands or the face. *Id*. If branding a hand is mutilation, so too is electrocuting the entire body, which always leaves behind a charred corpse. *See Dawson*, 554 S.E.2d at 143 (acknowledging that the body is mutilated "whether or not the electrocution protocols are correctly followed and the electrocution equipment functions properly").

- 26 -

75.     Additionally, some of the staunchest originalists agree that some mutilating punishments accepted at the Founding would now be unconstitutional. *See* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. CIN. L. REV. 849, 861 (1989) (acknowledging as unconstitutional laws "providing public lashing, or branding of the right hand, as punishment . . . [e]ven if it could be demonstrated unequivocally that these were not cruel and unusual measures in 1791."). Again, if branding of the right hand amounts to unconstitutional mutilation, so does electrocuting a person until his body is blistered and his brains cooked. *See Dawson*, 554 S.E.2d at 144.

76.     To be sure, electrocution causes the prisoner's organs to boil, head to catch fire, eyes to pop, or his body to blister, giving off the nauseating odor of burning flesh. *Glass*, 471 U.S. at 1087–88 (Brennen, J., dissenting from denial of certiorari). In all electrocutions, the prisoner suffers severe burns with charring of the tissues, many times including burns to the legs and scrotum. *See* Jonathan L. Arden Aff. ¶¶ 9, 14. The person's brain can also cook to the point of swelling, a process that must happen while the prisoner is alive. *Id*. at ¶ 10. The body is mutilated "whether or not the electrocution protocols are correctly followed and the electrocution equipment functions properly." *Dawson*, 554 S.E.2d at 143.

77.     Because of the mutilation to the prisoner's body, Georgia and Nebraska, two states accounting for more than 15% of the nation's electrocutions, have declared electrocution cruel and unusual punishment, regardless of pain. *Mata*, 745 N.W.2d 229; *Dawson*, 554 S.E.2d 137; *see also Execution Database*, DPIC.

78.     The Nebraska Supreme Court concluded that electrocution's "proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man." *Mata*, 745 N.W.2d at 278. Under today's scientific standards,

electrocution "has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of state prisons." *Id.* (internal quotations omitted).

79.    Similarly, the Georgia Supreme Court could not "ignore the cruelty inherent in punishments that unnecessarily mutilate or disfigure the condemned prisoner's body or the unusualness that mutilation creates in light of viable alternatives which minimize or eliminate the pain and/or mutilation." *Dawson*, 554 S.E.2d at 143. State autopsy reports revealed that "the bodies are burned and blistered with frequent skin slippage from the process." *Id.* And all experts in the case agreed that "the brains of the condemned prisoners are destroyed in a process that cooks them at temperatures between 135 and 145 degrees Fahrenheit." *Id.*

80.    Mutilating a prisoner's body through electrocution violates human dignity, especially when lethal injection is available. When compared to lethal injection, electrocution "inflicts purposeless physical violence and needless mutilation that makes no measurable contribution to accepted goals of punishment." *Dawson*, 554 S.E.2d at 143.

## Lethal Injection is a Readily Available Alternative that Significantly Reduces the Risk of Severe Pain Posed by Electrocution

81.    A condemned person bears the burden of proposing a feasible and readily available alternative, although that proposed alternative need not be one that is "presently authorized by a particular state's law." *Bucklew*, 139 S. Ct. at 1128; *see also id.* at 1136 (Kavanaugh, J., concurring) (noting that the entire *Bucklew* Court agreed on this point).

82.    Lethal injection is a readily available alternative that significantly reduces the risk of severe pain posed by the electric chair.

83.    The Supreme Court of the United States has made clear that lethal injection is "the most humane [execution method] available." *Baze*, 553 U.S. at 62.

84.     When carried out properly, lethal injection can largely eliminate the risk of pain that comes with other methods of execution. *Lee*, 140 S. Ct. at 2591. As a result, there is a "consensus among the States and the Federal Government that lethal injection is the most humane method of execution." *Bredesen*, 486 F.3d at 907.

85.     Defendants should execute Plaintiff with a single dose of pentobarbital. *See Lee*, 140 S. Ct. at 2591 (observing that a single dose of pentobarbital is "widely conceded to be able to render a person fully insensate and does not carry the risks of pain that some have associated with other lethal injection protocols" (internal quotations omitted)).

86.     Defendants could execute Plaintiff similarly to how the federal government carried out 13 lethal injections in the last year. *See* 2019 Addendum to Federal Execution Protocol, attached as Exhibit 7.

87.     The federal procedure calls for a first dose containing "2.5 grams of Pentobarbital Sodium in 50 mL of diluent" *Id*. at 2. This injection should quickly render the prisoner unconscious. A second injection with the exact same solution is administered. *Id*. A third injection of 60 milliliters of saline solution is then used to flush the equipment. *Id*. The prisoner's heart is monitored throughout the execution. *Id*.

88.     Pentobarbital has "been adopted by five of the small number of States that currently implement the death penalty." *Lee*, 140 S. Ct. at 2591. It has been used in "over 100 executions, without incident," and it has been "repeatedly invoked by prisoners as a less painful and risky alternative to the lethal injection protocols of other jurisdictions." *Id*.

89.     Capital punishment by a single dose of pentobarbital has twice been explicitly upheld by the Supreme Court of the United States. *Id*.; *Bucklew*, 139 S. Ct. 1112. And it has repeatedly been upheld by numerous Courts of Appeals. *See*, *e.g.*, *Whitaker v. Collier*, 862 F. 3d

490 (5th Cir 2017); *Zink v. Lombardi*, 783 F. 3d 1089 (8th Cir 2015); *Gissendaner v. Commissioner*, 779 F. 3d 1275 (11th Cir 2015).

90.    When suggesting an alternative method of execution, a "prisoner may point to a well-established protocol in another State as a potentially viable option." *Bucklew*, 139 S. Ct. at 1128. States should make good-faith efforts to carry out the prisoner's suggested alternative method of execution. *See id.* at 1125.

91.    South Carolina has failed to make a good-faith effort to obtain lethal injection drugs.

92.    Indeed, 14 states have used pentobarbital to carry out executions: Alabama, Alabama, Arizona, Delaware, Florida, Georgia, Idaho, Mississippi, Missouri, Ohio, Oklahoma, South Carolina, South Dakota, Texas, and Virginia. *Overview of Lethal Injection Protocols*, DPIC, https://deathpenaltyinfo.org/executions/lethal-injection/overview-of-lethal-injection-protocols. Five more states plan to use it: Kentucky, Louisiana, Montana, North Carolina, and Tennessee. *Id.* States and the federal government have carried out dozens of executions with pentobarbital over the last eight years while Defendants have claimed it is unavailable. More executions with pentobarbital are scheduled later this year.

93.    Lethal injection is by far the most prevalent method of execution in the United States. American jurisdictions have settled on lethal injection as the most humane method of execution after a 100-plus year history of searching for humane methods of execution. Until South Carolina's recent amendment, every death penalty jurisdiction in the country used lethal injection as its primary method of execution.

94.    Of the nation's 1,533 executions since 1976, nearly 90% (1,353) of them have been carried out by lethal injection. *Execution Database*, DPIC. In the same period, only 163 executions have been by electrocution, with more than 140 of these occurring in the 70s, 80s, and 90s. *Id*.

95.    In the last year, 15 executions have been carried out by lethal injection. *Id*. All of them by a single dose of pentobarbital.

96.    In the last few months, Arizona has secured a new batch of pentobarbital. Jacques Billeaud, *Arizona finds death penalty drug after hiatus in executions*, AP News, March 5, 2021, https://apnews.com/article/arizona-phoenix-executions-6f0ce846e174119635509e0c16b9ac1d.

97.    Since 2013, when Defendants first claimed they would have trouble obtaining lethal injection drugs, 13 states and the federal government have carried out 207 lethal injections. *Id*.

98.    Texas carried out the fourth lethal injection of the year on May 19, less than two weeks ago. *Id*. It used a single dose of pentobarbital. Juan A. Lozano and Michael Graczyk, Absent media, *Texas executes inmate who killed great aunt*, AP News, May 19, 2021, https://apnews.com/article/texas-executions-lifestyle-747fc8994706df9dee9e64909c464b99. The prisoner was pronounced dead 12 minutes after the drug was administered. *Id*.

99.    Lethal injection is a "proven alternative method" with a "track record of successful use." *Bucklew*, 139 S. Ct. at 1130.

100.    While Plaintiff has a duty to present a readily available alternative to electrocution, Defendants have a corresponding duty to make a good faith effort to implement that alternative. Defendants cannot use a substantially more painful method of execution simply because they have failed to acquire execution drugs. As evident by the hundreds of lethal injections taking place, Defendants could have obtained the necessary drugs to carry out Plaintiff's execution had they properly prepared. Instead, they did not prepare and now seek to use the electric chair.

**Electrocution is Inconsistent with the Evolving Standard of Decency**

101.    Adjacent to the Supreme Court's method-of-execution analysis is its proportionality analysis.[5] The Court's proportionality analysis looks to the "objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." *Simmons*, 543 U.S. at 564. Consensus among the country's legislatures gives the Court "essential instruction" on the bounds of the Eighth Amendment. *Id*. Indeed, under the original meaning of the Eighth Amendment, a punishment could become "unusual" by being "disallowed by legislative reform." John Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1814 (2008). Additionally, actual "practices are an important part of the Court's inquiry into consensus," *Graham*, 560 U.S. at 62, as is "the consistency of the direction of change." *Atkins*, 536 U.S. at 315. Once the consensus inquiry is complete, the Court brings its own judgment to bear "by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators." *Id*. at 313.

102.    Though the consensus analysis is typically reserved for determining whether a punishment is disproportionate to a crime or an offender, the Supreme Court has applied it in other death penalty contexts. *See Hall*, 572 U.S. at 714–18 (holding that a ceiling IQ score of 70 for raising Atkins claims is against consensus and unconstitutional).

103.    Today, there is a strong consensus against the use of the electric chair.

104.    When the Supreme Court of the United States invalidated the death penalty for people with intellectual disabilities (ID), only 20 jurisdictions authorized the practice. *Atkins*, 543

---

[5] *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304 (2002) (death penalty is disproportionate for people with intellectual disabilities); *Roper v. Simmons*, 543 U.S. 551 (2005) (death penalty is disproportionate for juvenile offenders); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (death penalty is disproportionate for the rape of a child); *Graham v. Florida*, 560 U.S. 48 (2010) (life without parole is disproportionate for nonhomicide juvenile offenders); *Miller v. Alabama*, 567 U.S. 460 (2012) (mandatory life without parole is disproportionate for juvenile offenders).

U.S. at 313–15. Three years later, the Court did the same for juvenile offenders, and again only 20 jurisdictions authorized the practice. *Roper*, 543 U.S. at 564–65. Both times, the Court noted that the practices, though authorized, were rarely carried out. *Id*. In the decade before *Atkins*, only five states had executed a person with a known IQ below 70, and in the decade before *Roper*, only three states had executed a juvenile offender. *Id*. The Court also noted the consistency of change with consensuses surrounding the practices. *Id*. at 565–67. In the decades before *Atkins* and *Roper*, states abandoned the penalties, but no state enacted new laws permitting them. *Id*. at 565–66.

105.     Similarly, when the Court invalidated mandatory life without parole (LWOP) for juveniles, the practice was authorized in 29 jurisdictions. *Miller*, 567 U.S. at 484. But the Court reasoned that simply counting the jurisdictions presented a "distorted view." *Id*. In most of the jurisdictions, mandatory LWOP had been designed for adults, and so the penalty was without "deliberate, express, and full legislative consideration." *Id*. at 485–87 (quoting *Graham*, 560 U.S. at 67). And when the Supreme Court invalidated LWOP for nonhomicide juvenile offenders, it did so despite 39 jurisdictions authorizing the practice. *Graham*, 560 U.S. at 62. In practice, however, there were only 124 juvenile offenders in 11 jurisdictions serving LWOP for a nonhomicide offense. *Id*. at 64. The actual numbers made clear how rare the penalty was, leading to the Court's conclusion that a consensus had developed against LWOP for nonhomicide juvenile offenders. *Id*. at 65.

106.    Today, seven states authorize execution by electrocution, but this view too is distorted.[6] Of the seven states, electrocution is a back-up in six of them.[7] As a backup, electrocution is only used if the prisoner selects it, if other methods are held unconstitutional, or if other methods are unavailable. *See supra* Note 7. Only in South Carolina is electrocution the default method authorized under law, a number lower than the authorization numbers in *Atkins*, *Roper*, *Graham*, and *Miller*. South Carolina is also the only state to declare more humane methods of execution "unavailable" and force a prisoner to be electrocuted.

107.    In practice, electrocution is rarely used. In the last ten years, only two states (Tennessee and Virginia) have executed someone by electrocution, again a number lower than the five and three states mentioned in *Atkins* and *Roper*, respectively. *See Execution Database*, DPIC. Additionally, the percentages of executions made up by electrocutions has continually declined since the 1970s. *Id*. From 1976 and through the 80s, electrocutions made up 63% of the executions. *Id*. Then in the 90s, that number shrank to 15%. *Id*. In the first decade of the twentieth century, 2% of all executions were carried out by electrocution. *Id*. And since 2010, again only 2% (7 total) of the executions carried out in the United States have been by electrocution. *Id*.

108.    The direction of change in the United States has consistently been against the use of the electric chair. Additionally, legislative support and actual practices of electrocution have dragged since the 1970s. Electrocution is far less common than the practices found in *Atkins*, *Roper*, *Graham*, and *Miller*.

---

[6] The seven states are Alabama, Ala. Code § 15-18-82.1(a); Florida, Fla. Stat. § 922.105(1); Kentucky, Ky. Rev. Stat. § 431.220(b); Mississippi, Miss. Code Ann. § 99-19-51(3); Oklahoma, Okla. Stat. tit. 22, § 1014(C); South Carolina, S.C. Code Ann. § 24-3-530(A); and Tennessee, Tenn. Code § 40–23–114(b).

[7] *See* Alabama, Ala. Code § 15-18-82.1(a); Fla. Stat. § 922.105(1); Ky. Rev. Stat. § 431.220(b); Miss. Code Ann. § 99-19-51(3); Okla. Stat. tit. 22, § 1014(C); Tenn. Code § 40–23–114(b).

**Count III: Preliminary Injunction**

109.    Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this complaint as if set forth in full below.

110.    Defendants' efforts to execute Plaintiff by an unconstitutional means threatens to permanently deprive him of his federal constitutional rights. Unless they are enjoined, Defendants will carry out Plaintiff's execution on June 25, 2021, using a process that is nearly certain to produce severe and unnecessary pain. Plaintiff will soon file a motion requesting a temporary restraining order and a preliminary injunction.

**Count IV: Declaratory Judgment Pursuant to 28 U.S.C. § 2201**

111.    Plaintiff realleges and incorporates herein by reference all preceding paragraphs of this complaint as if set forth in full below.

112.    Executing Plaintiff by judicial electrocution will violate his rights under the federal constitution.

**PRAYER FOR RELIEF**

Plaintiff Freddie E. Owens requests that this Court:

1.  Grant a preliminary injunction prohibiting Defendants from carrying out, or attempting to carry out, any executions by electrocution unless a condemned inmate selects electrocution as the method of execution.

2.  Grant declaratory relief, as requested in this Complaint.

3.  Grant any further relief as the Court deems just and proper.


Respectfully submitted,

s/ Emily C. Paavola

- 35 -

GERALD W. KING
*Application for pro hac vice pending*
FEDERAL PUBLIC DEFENDER
CAPITAL HABEAS UNIT
129 WEST TRADE, ST., STE 300
CHARLOTTE, NC 29202
(704) 688-6946

EMILY C. PAAVOLA
Fed. ID #11488
JUSTICE 360
900 Elmwood Ave, Suite 200
Columbia, SC 29201
(803) 765-1044